**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| SALLYPORT COMMERCIAL FINANCE, LLC, a Delaware Limited Liability Company, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 4:22-CV-02872 |
| RETROLOCK COROPORATION, a California corporation, TANIA TOMYN, an individual, AARON SMITH, an individual, and AT INSTALLATION, INC., a California corporation, | § § § § § § | |
| Defendants. | § § | |

**PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND**

**PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................ii

TABLE OF AUTHORITIES ........................................................................................ iv

SUMMARY OF RELIEF REQUESTED ..................................................................... 1

SUMMARY OF ARGUMENT ..................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 3

1. In July of 2021, Sallyport agreed to factor Retrolock's accounts receivables to provide Retrolock with desperately needed working capital. ........................................................ 3

2. To secure Retrolock's obligation to Sallyport, Retrolock and ATI granted security interests in their "general intangibles." ................................................................... 5

3. Retrolock promised to give Sallyport 30 days' advance notice if it intended to move offices or dispose of any collateral. ....................................................................... 6

4. Retrolock warranted that it was and would remain solvent. ................................... 6

5. In case Retrolock defaulted, Retrolock agreed in advance that Sallyport had an "irrevocable" power of attorney to redirect Retrolock's mail and to endorse any checks payable to Retrolock. ..................................................................................... 6

6. Sallyport also obtained guaranties from Tomyn, Smith, and ATI plus a security interest in ATI's general intangibles. ................................................................... 7

7. Sallyport began factoring Retrolock's accounts receivables, purchasing them at a discount. ................................................................................................................. 7

8. Three months later, Retrolock needed more working capital, and Sallyport agreed to extend a loan to Retrolock. .................................................................................... 7

9. By late fall 2021, Retrolock's customers began disputing Retrolock's invoices that had been factored (purchased) by Sallyport. ................................................................ 8

10. By January 2022, Retrolock, Tomyn, Smith, and ATI were in default of their obligations.9

11. In January 2022, Retrolock and ATI disclosed to Sallyport that they had significant federal payroll tax credit refunds as employee retention credits under the CARES Act of 2020..................................................................................................................... 10

12. In January 2022, a Forbearance Agreement was reached in which Retrolock, Smith, Tomyn, and ATI admitted they owed Retrolock over $4.5 million................................. 11

13. By Spring of 2022, Retrolock's condition deteriorated such that Sallyport exercised its power of attorney to direct Retrolock's mail to Sallyport to collect any checks payable to Sallyport, including any IRS tax refunds. .......................................................... 11

14. To frustrate Sallyport's ability to collect checks, including any coming from the IRS, Retrolock interfered with Sallyport's right to receive Retrolock's mail and switched its address with the Post Office and the IRS.......................................................... 12

15. Retrolock admitted its business was "closed" and that it was "broke."........................ 14

STANDARD OF REVIEW ........................................................................................... 15

ARGUMENT ............................................................................................................... 15

   1.  Sallyport has a substantial likelihood of prevailing on the merits. .................... 15

      A.  Retrolock, ATI, Tomyn, and Smith admit the debt to Sallyport exceeds $4.5 million. ......................................................................................................... 15

      B.  Retrolock's debt to Sallyport is secured by Retrolock's and ATI's "general intangibles." ............................................................................................... 16

      C.  Retrolock's and ATI's Employee Retention Tax Credit refunds are "general intangibles." ............................................................................................... 17

   2.  Sallyport will suffer irreparable harm if injunctive relief is not granted. .......................... 18

      A.  Money damages are not an adequate remedy where the defendant is already insolvent. ................................................................................................... 19

      B.  Garnishment of the IRS to trap Retrolock's and ATI's Employee Retention Tax Credit refunds is not an available remedy because the IRS is immune from garnishment writs................................................................................................... 20

      C.  Neither pre-judgment sequestration nor attachment are available remedies as both are limited to tangible property, and the Employee Retention Tax Credit refunds are intangible................................................................................................... 20

   3.  The harm of not freezing the Employee Retention Tax Credit refund outweighs any harm to Retrolock as Retrolock admits its business is closed................................... 21

   4.  Issuing temporary and preliminary injunctive relief will not impact public interests. ...... 22

CONCLUSION............................................................................................................ 22

CERTIFICATE OF CONFERENCE............................................................................. 23

# TABLE OF AUTHORITIES

**Cases**

*Amegy Bank, N. A. v. Monarch Flight II, LLC,* No. H-11-3218, 2011 WL 6091807 (S.D. Tex. Dec. 7, 2011) ................................................................................................................ 2, 19

*A.T.N. Industries v. Gross*, 622 Fed. Appx. 185 (5th Cir. 2015) ................................... 22

*Brockelman v. Brockelman*, 478 F. Supp. 141 (D. Kan. 1979) ...................................... 20

*Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987) .................................................. 15

*Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp*., 17 F.3d 691 (4th Cir.1994). .......... 19

*In re American Home Furnishings Corp*., 48 B.R. 905 (W.D. Wash. 1985) .............................. 17

*In re Kendrick and King Lumber, Inc*., 14 B.R. 764 (Bankr. W.D.Okla.1981)........................... 18

*In re Kingswood*, 343 F.Supp. 498 (C.D. Cal.1972)........................................................ 18

*In re Metric Metals Int'l, Inc*., 20 B.R. 633 (S.D.N.Y. 1981) ...................................... 17

*In re Scherbenske Excavating, Inc*., 38 B.R. 84 (Bankr. D.N.D.1984) .............................. 18

*In re TMCI Elecs*., 279 B.R. 552 (N.D. Cal. 1999) ...................................................... 17

*In re TWI, Inc*., 39 U.C.C.Rep.Serv. 1031 (4th Cir. 1984) (unpublished)................................... 18

*Janvey v. Alguire*, 647 F.3d 585 (5th Cir.2011)............................................................ 19

*Kelly v. Hickman*, No: 21cv1226-BEN-MDD, 2021 WL 4473177 (S.D. Cal. Sept. 30, 2021) ... 17

*Pashatan v. Eccelston Props., Ltd*., 88 F.3d 77 (2d Cir. 1996) ...................................... 19

*Siff v. State Democratic Exec. Comm*., 500 F.2d 1307 (5th Cir. 1974) ........................... 15

*Skoreychenko v. Tompkins*, No. 08-CV-626-bbc, 2010 WL 138385 (W.D. Wis. Jan. 12, 2010)  20

*State of Tex. v. Seatrain Int'l, S. A*., 518 F.2d 175 (5th Cir. 1975) .............................. 15

*Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) . 15, 19

**Statutes**

42 U.S.C. § 659 .......................................................................................................... 20

Pub. L. No. 116-136, 134 Stat. 281, § 2301 .............................................................. 18

Pub. L. No. 117-2, 135 Stat. 4, § 9651 ...................................................................... 18

Tex. Bus. & Comm. Code § 9.102(42) ...................................................................... 17

Tex. Bus. & Comm. Code § 9.203 .................................................................... 16, 17

Tex. Bus. & Comm. Code § 62.001 .......................................................................... 20

Tex. Civ. Prac. & Rem. Code § 61.041 .................................................................... 21

***Other Authorities***

Atkins, B. "Prejudgment Remedies", 32 THE ADVOC. (TEXAS) 15 (Fall 2005) ........................... 21

***Rules***

FED. R. CIV. P. Rule 64 ...................................................................................... 20

FED. R. EVID. Rule 1006 .................................................................................... 10

***Regulations***

Temporary Income Tax Regulation, 86 Fed. Reg. 50637 (Sept. 20, 2021) ........................... 10, 18

## SUMMARY OF RELIEF REQUESTED

To prevent dissipation of Defendants Retrolock Corporation's ("Retrolock") and AT Installation, Inc.'s ("ATI") sole remaining assets – approximately $2.1 million in federal tax refunds the IRS owes Retrolock and $1.4 million in federal tax refunds the IRS owes ATI, in which Plaintiff Sallyport Commercial Finance, LLC ("Sallyport") has security interests – the Court should temporarily restrain and preliminarily enjoin Retrolock, ATI, their principals, Tania Tomyn and Aaron Smith, and those acting in concert with them, from cashing, negotiating, depositing, transferring, assigning or otherwise alienating any check which they receive from the United States Treasury or the Internal Revenue Service issued to Retrolock or ATI for such refunds, and ordering them to notify Sallyport, and its counsel, in writing upon Retrolock's and/or ATI's receipt of such refunds.

## SUMMARY OF ARGUMENT

Sallyport meets all four elements for a temporary restraining order ("TRO") and preliminary injunction.  First, Sallyport has a substantial likelihood of prevailing on the merits.  In a January 12, 2022 Forbearance Agreement with Plaintiff Sallyport, Defendants Retrolock, ATI, Tomyn, and Smith admitted that they are indebted to Sallyport for in excess of $4.5 million for funds advanced under a Factoring Agreement (to provide working capital by purchasing Retrolock's accounts receivable) and subsequent loan addendum, and that Sallyport has a security interest in federal tax refunds Retrolock and ATI anticipate receiving from the IRS under the Employee Retention Tax Credit program enacted by Congress under the CARES Act of 2020. Similarly, in the same Forbearance Agreement, Defendants Tomyn, Smith, and ATI admitted their liability for such indebtedness under written guaranties they had each signed contemporaneously

1

with the Factoring Agreement and the subsequent loan addendum.  Based on the foregoing, Sallyport has a substantial likelihood of prevailing on the merits of its underlying claims.

Second, Sallyport will suffer irreparable harm if a TRO and preliminary injunction do not issue.  Since the Forbearance Agreement was signed, Retrolock has disposed of substantially all of its remaining equipment and inventory, closed its business doors and admits it is now "broke." Its sole remaining asset is the $2.1 million employee retention tax credit refund, in which Sallyport has a security interest, and ATI's sole remaining asset is the $1.4 million employee retention tax credit refund, in which Sallyport has a security interest.  Anticipating the possibility that Retrolock might one day default on its obligations to Sallyport, the Factoring Agreement contract provided Sallyport with Retrolock's irrevocable power of attorney to change Retrolock's mailing address with the Postal Service and to endorse and deposit any checks made payable to Retrolock.  When Sallyport learned that Retrolock had defaulted further after executing the Forbearance Agreement, Sallyport exercised its contractual right to change Retrolock's mailing address so as to receive any checks that might come to Retrolock, including any IRS refund checks. Retrolock approved this change of address.  Sometime after, however, Retrolock went to not only the Postal Service, but also the IRS, and switched its address again.  Though Sallyport has been able to change the postal address back to Sallyport, Sallyport cannot change Retrolock's address with the IRS.  Thus, any IRS check(s) refunding the tax credits in which Sallyport has a security interest will go to Retrolock and ATI or to an address designated by them.  Where a defendant is insolvent – Retrolock admits it is "broke" – and is likely to dissipate assets pending a trial on the merits, interim injunctive relief is proper.  *See Amegy Bank, N. A. v. Monarch Flight II, LLC,* No. H-11-3218, 2011 WL 6091807 (S.D.Tex. Dec. 7, 2011).

2

Third, any harm to Retrolock or ATI of freezing their sole remaining asset – in which Sallyport has a perfected security interest – is outweighed by the harm Sallyport will suffer if Retrolock and ATI are allowed to spend Sallyport's collateral.  Without such collateral, there are no remaining assets to satisfy Retrolock, Tomyn, Smith, and ATI's debt to Sallyport.

Fourth, as this is a private dispute, there is no public interest that would be adversely affected by granting injunctive relief.

Accordingly, Sallyport meets all four elements for a TRO and preliminary injunction.

## STATEMENT OF FACTS

1. **In July of 2021, Sallyport agreed to factor Retrolock's accounts receivables to provide Retrolock with desperately needed working capital.**

Sallyport is in the factoring business.  *See* accompanying Emma Hart's Declaration at Exhibit A ("Hart Declaration") at ¶ 7.[1]  Generally, factors, like Sallyport, provide working capital to clients by agreeing to purchase, at a discount, some or all of a client's accounts receivables for the goods and/or services the client has provided to its customers.  In turn, the client's customers are typically instructed by the client and Sallyport to pay Sallyport.  *Id.* at ¶ 7.  Factoring allows the client to receive a portion of the invoice up front from the factor as working capital, with the balance when the factor receives payment, less fees for the factoring service.

Many who seeking factoring are unable to obtain conventional financing.  Accordingly, factors take the risk when buying a client's receivable that the client's customer will not, or cannot,

---

[1] The Hart Declaration (attached hereto as Exhibit A), including all of its Exhibits, is made a part hereof for all purposes and incorporated herein, and the facts and statements set forth in the Hart Declaration support the relief requested in this Motion.

pay the receivable.  To mitigate the risk of non-payment, Sallyport requires collateral and guaranties from the client's principals as well as warranties, representations, and covenants regarding the client's business and conduct.  For example, Sallyport commonly requires its clients provide a security interest under the Uniform Commercial Code in all of the client's accounts (whether or not purchased by Sallyport from the client), equipment, general intangibles (such as federal income tax refunds and tax credits), electronic chattel paper, inventory and equipment, and many other forms of personal property, including the proceeds from their disposition.  Sallyport also commonly requires personal written guaranties from the principals of its client, as well as related financially responsible individuals and third parties, and sometimes requires those guarantors to provide a security interest in various forms of property to secure their obligations as guarantors.  Sallyport also commonly requires various warranties, representations, and covenants with regard to the client's business conditions, operations, and solvency.  *Id.* at ¶ 8.

In early June 2021, Retrolock contacted Sallyport seeking working capital through a factoring arrangement.  Retrolock was then a southern California based company engaged in providing doors and related components for commercial construction projects in California.  *Id.* at ¶ 9. On June 18, 2021, Sallyport and Retrolock entered into a written factoring agreement (entitled "Account Sale and Purchase Agreement" – herein referred to for brevity as the "Factoring Agreement").[2]  *Id.* at ¶ 10.

---

[2] A page number reference to the Factoring Documents (Exhibit 1), which include the Factoring Agreement and other related documents executed simultaneously, including guaranties entered into by the other Defendants, shall mean a reference to the Bates-stamped page number on the bottom right corner of the document.

**2.   To secure Retrolock's obligation to Sallyport, Retrolock and ATI granted security interests in their "general intangibles."**

The Factoring Agreement provided, among other provisions, the following relevant to this

Motion:

i.   Section 2.2, which defined the purchase price for each receivable Sallyport elected to purchase as the face amount of the receivable, but giving Sallyport the discretion either to wait to pay the price in full at such time as Sallyport received payment of the invoice from Retrolock's client or to advance a portion of the purchase price while awaiting payment of the invoice by Retrolock's client.  *See* page 3 of Exhibit 1 to the Hart Declaration.

ii.   Section 2.6, which obligated Retrolock to take back, or repurchase, at the unpaid face amount of the invoice, any receivables purchased by Sallyport from Retrolock meeting any of the following conditions: (1) the invoice had not been paid to Retrolock by the Retrolock's customer within 90 days of invoice date, (2) Retrolock had breached any warranties or promises made in the Factoring Agreement with respect to an invoice purchased by Sallyport, (3) a dispute had arisen between Retrolock and its customer over an invoice purchased by Sallyport, (4) Retrolock's customer asserted a claim or loss of any kind against Retrolock or Sallyport, or (5) Retrolock's customer became insolvent or financially unable to pay. *See* page 3 of Exhibit 1 to the Hart Declaration.

iii.   Section 3, which granted Sallyport a security interest in Retrolock's accounts, equipment, inventory, and general intangibles to secure all of Retrolock's obligations to Sallyport under the Factoring Agreement.[3] *See* page 4 of Exhibit 1 to the Hart Declaration.

---

[3] The term "Obligations" is defined in Section 1.29 of the Factoring Agreement to mean:

[E]ach and all of the following: the obligation to pay and perform when due all debts and all obligations, liabilities, covenants, agreements, guaranties, warranties and representations of Seller to Purchaser, of any and every kind and nature, whether heretofore, now or hereafter owing, arising, due or payable from Seller to Purchaser; howsoever created, incurred, acquired, arising or evidenced; whether primary, secondary, direct, absolute, contingent, fixed, secured, unsecured, or otherwise; whether as principal or guarantor; liquidated or unliquidated; certain or uncertain; determined or undetermined; due or to become due; as a result of present or future advances or otherwise; joint or individual; pursuant to or caused by Seller's breach of this Agreement, or any other present or future agreement or instrument, or created by operation of law or otherwise; evidenced by a written instrument or oral; created directly between Purchaser and Seller or owed by Seller to a third party and acquired by Purchaser from such third party; monetary or nonmonetary.

*See* page 2 of Exhibit 1 to the Hart Declaration.

**3. Retrolock promised to give Sallyport 30 days' advance notice if it intended to move offices or dispose of any collateral.**

In Section 4.4 of the Factoring Agreement, Retrolock warranted and represented to Sallyport that it would provide Sallyport 30 days' advanced written notice of the moving of any the Collateral from the addresses specified in the Factoring Agreement. *See* page 5 of Exhibit 1 to the Hart Declaration.

**4. Retrolock warranted that it was and would remain solvent.**

In Section 4.10 of the Factoring Agreement, Retrolock warranted that it was and would remain solvent, and that such warranty and representation would be deemed to be breached if at any time Sallyport estimated that the value of Retrolock's assets, if sold in bulk for liquidation purposes, would not be sufficient to pay the total of Retrolock's liabilities. *See* page 6 of Exhibit 1 to the Hart Declaration.

**5. In case Retrolock defaulted, Retrolock agreed in advance that Sallyport had an "irrevocable" power of attorney to redirect Retrolock's mail and to endorse any checks payable to Retrolock.**

In Section 8 of the Factoring Agreement, Retrolock gave Sallyport an irrevocable power of attorney allowing Sallyport to direct Retrolock's mail to Sallyport after a default by Retrolock on the Factoring Agreement's obligations to Sallyport. Section 8 stated as follows:

> <u>Power of Attorney</u>. [Retrolock] grants to [Sallyport] an irrevocable power of attorney coupled with an interest authorizing and permitting [Sallyport] (acting through any of its employees, attorneys or agents) at any time, at its option but without obligation, with or without notice to [Retrolock], and at [Retrolock]'s sole expense, to do any or all of the following, in [Retrolock]'s name or otherwise: … (e) upon the occurrence of any Event of Default, to receive and open all mail addressed to [Retrolock]; and, in the exercise of such right, [Sallyport] shall have the right, in the name of [Retrolock], to notify the Post Office authorities to change the address for the delivery of mail addressed to [Retrolock] to such other address as [Sallyport] may designate, including, but not limited to, [Sallyport]'s own address; [Sallyport] shall turn over to [Retrolock] all of such mail not relating to the Collateral; such right to redirect mail granted to [Sallyport]

is irrevocable and [Retrolock] shall not have the right to notify the Post Office to change the address for delivery after [Sallyport] has exercised such right… .

*See* pages 10-11 of Exhibit 1 to the Hart Declaration.

**6. Sallyport also obtained guaranties from Tomyn, Smith, and ATI plus a security interest in ATI's general intangibles.**

To mitigate the risk that Retrolock might one day lack resources to pay its Obligations to Sallyport, Sallyport secured written guaranties of Retrolock's Obligations to Sallyport from Defendants Tomyn, Smith, and ATI. *See* pages 31, 44, and 57 of Exhibit 1 to the Hart Declaration, ¶ 16. ATI is an affiliate of Retrolock (owned by Defendant Tomyn) that provided union laborers for Retrolock's projects. ATI, in turn, granted Sallyport with a security interest in, among other things, its general intangibles, to secure ATI's obligations as a guarantor. *See* Section 25 of ATI's guaranty, at page 65 of Exhibit 1 to the Hart Declaration.

**7. Sallyport began factoring Retrolock's accounts receivables, purchasing them at a discount.**

Immediately upon signing the Factoring Agreement, Sallyport purchased then-existing Retrolock receivables and began advancing funds to Retrolock for the purchase of those receivables. Exhibits 1 – 20 to the Hart Declaration are Sallyport's business records showing by date the amounts of receivables purchased, when Sallyport advanced funds toward the purchase of Retrolock receivables, and the factoring fees and expenses charged. The amount of receivables reflected in those exhibits fluctuated as some receivables were paid and others were not.

**8. Three months later, Retrolock needed more working capital, and Sallyport agreed to extend a loan to Retrolock.**

Within three months of the factoring beginning, Retrolock informed Sallyport that it needed further, additional working capital to keep its doors open, to pay urgent vendors, payroll, quarterly employment taxes, and complete projects, particularly those representing receivables

which Sallyport had either purchased or were serving as collateral for Retrolock's obligations to Sallyport under the Factoring Agreement.  If Sallyport did not provide Retrolock with funds to keep its doors open and allow it to complete performance, there was little, if any, likelihood of Sallyport being paid on purchased receivables.  Hart Declaration at ¶ 22.

To meet Retrolock's request for further working capital, Sallyport agreed to provide Retrolock with a term loan of up to $500,000.00. *Id.* at ¶ 23.   The terms for this loan are reflected in Cash Flow Addendum to Account Sale and Purchase Agreement (for brevity, the "Cash Flow Addendum") signed by Retrolock and Sallyport.  *See* Exhibit 4 to the Hart Declaration.  Advances under the Cash Flow Addendum to Retrolock were at Sallyport's sole discretion.  *See* ¶ 2 on page 1 of Exhibit 4 to the Hart Declaration.  Retrolock's promise to repay the loan with interest is set forth in paragraphs 3 and 5 of the Cash Flow Addendum.  Retrolock's promise to repay funds advanced under the Cash Flow Addendum were incorporated into the definition of "Obligations" in the Factoring Agreement and were "secured by the Collateral pursuant to the terms of [Factoring Agreement]."  *See* ¶ 4 on Page 1 of Exhibit 4 to the Hart Declaration.   Exhibits 1-20 to the Hart Declaration are Sallyport's business records showing by date the amounts advanced on the Cash Flow Addendum to Retrolock, the interest accruals, and the dates when payments of principal and interest were made or applied.

**9.   By late fall 2021, Retrolock's customers began disputing Retrolock's invoices that had been factored (purchased) by Sallyport.**

Although Sallyport was generally collecting payments on accounts receivable it had purchased from Retrolock through October 2021, by early November 2021 Sallyport learned that one of Retrolock's customers had decided to offer payment towards several very large receivables for a construction project by making its checks jointly payable to Retrolock and other vendors to Retrolock.  In other words, the checks would not, and did not, come to Sallyport as called for on

all customer payments on receivables Sallyport purchased, but Retrolock endorsed the checks over to the vendors instead.  The situation deteriorated further throughout November and December of 2021.  Meanwhile Retrolock continued to ask for additional working capital to meet its weekly payroll to keep its employees working to finish existing projects forming the basis of receivables Sallyport had purchased.  Hart Declaration at ¶ 26.

By the end of December 2021, it became apparent that Retrolock was in default under the terms of the Factoring Agreement and the Cash Flow Addendum in the following ways.  First, although Retrolock had warranted and represented to Sallyport in Section 4.6 of the Factoring Agreement that each account receivable presented to Sallyport for purchase represented a valid, undisputed receivable in which Retrolock's customer had accepted the goods sold and/or services provided without deduction or offset – see page 5 of Exhibit 1 to the Hart Declaration – Retrolock's customers began disputing Retrolock's invoices because Retrolock had failed to pay its vendors and other third parties, thereby jeopardizing the customer's construction projects.  Other Retrolock customers refused to pay invoices in their entirety.  Second, Retrolock reported that without even more working capital, Retrolock would not be able to pay its obligations as they were coming due, which would jeopardize Sallyport's ability to collect the account receivables it had purchased from Retrolock.  *Id.* at ¶ 27.

### 10. By January 2022, Retrolock, Tomyn, Smith, and ATI were in default of their obligations.

By January 2022, Retrolock was in default of its obligations to Sallyport because (1) its customers were not paying or were disputing invoices and (2) Retrolock had no cash to repurchase those receivables. *Id.* at ¶¶ 27-28.   Sallyport was prepared to begin enforcing its remedies under the Factoring Agreement, including the security interest therein set forth, and the guaranties.  *Id.* at ¶ 29.

**11. In January 2022, Retrolock and ATI disclosed to Sallyport that they had significant federal payroll tax credit refunds as employee retention credits under the CARES Act of 2020.**

As Retrolock and ATI asked for more time, they began sharing information with Sallyport regarding their anticipated multimillion-dollar federal payroll tax refunds known as Employee Retention Tax Credits ("ERTC") which had become available to employers under a provision of the CARES Act enacted on March 20, 2020, to encourage employers to maintain employees during the COVID-19 pandemic.[4]  *Id.* at ¶ 27.  The following is a summary of the information Retrolock provided to Sallyport:[5]

| Retrolock Corporation | | | | AT Installation | | |
|---|---|---|---|---|---|---|
| Quarter | Amount | | | Quarter | Amount | |
| Q2 2020 | ($53,703.20) | Paid by IRS to Retrolock | | | | |
| Q3 2020 | $420,016.23 | | | | | |
| *Total credit for 2020* | **$473,719.33** | | | | | |
| | | | | | | |
| Q1 2021 | $674,.714.00 | | | Q1 2021 | $162,771.00 | |
| Q2 2021 | $713,454.42 | | | Q2 2021 | $455,117.75 | |
| Q3 2021 | $235,057.58 | | | Q3 2021 | $762,217.31 | |
| *Total Credit for 2021* | **$1,633,226.00** | | | ***Total Credit for 2021*** | **$1,380,106.06** | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| ***Total Employee Retention Tax Credit*** | ***$2,106,945.33*** | | | ***Total Employee Retention Tax Credit*** | **$1,380,106.06** | |

*Id.* at ¶ 43.

---

[4] For a detailed discussion of the creation of the Employee Retention Tax Credit and its refundability, *see* Temporary Income Tax Regulation, 86 Fed. Reg. 50637 (Sept. 20, 2021).

[5] This is a summary offered under FED. R. EVID. Rule 1006 to prove content.  The voluminous underlying data on which the summary is based will be made available to opposing counsel at a reasonable time and place upon request.

**12. In January 2022, a Forbearance Agreement was reached in which Retrolock, Smith, Tomyn, and ATI admitted they owed Retrolock over $4.5 million.**

Ultimately, on January 12, 2022, Sallyport, Retrolock, Tomyn, Smith, and ATI agreed to a Forbearance Agreement.  So long as Retrolock, Tomyn, Smith, and ATI kept their commitments under the Forbearance Agreement, Sallyport agreed that it would forbear from exercising its remedies until June 30, 2022.  *Id.* at ¶ 29.  In the Forbearance Agreement, Retrolock, Tomyn, Smith, and ATI  acknowledged and admitted (1) their obligations to Sallyport, financial and otherwise, under the Factoring Agreement, the Cash Flow Addendum, and the Guaranties; (2) the Operative Documents[6] were in full force and effect; (3) events of default by Retrolock had occurred – namely, that Retrolock's customers had set off amounts due on receivables Sallyport had purchased; (4) those set offs caused Retrolock to lack funds to cover its expenses and other obligations to Sallyport; (5)  Tomyn, Smith, and ATI had defaulted on their guaranties; (6) due to the defaults, all amounts due under the Factoring Agreement, Cash Flow Addendum, and the Guaranties had been accelerated and were then due and owing (the outstanding amount owed to Sallyport on January 12, 2022  was $4,593,998.77, excluding fees incurred under the terms of the Factoring Agreement); and (7) any future failure to cooperate with Sallyport would qualify as an additional event of default giving Sallyport the right to end its forbearance.  *Id.* at ¶ 30; Exhibit 5.

**13. By Spring of 2022, Retrolock's condition deteriorated such that Sallyport exercised its power of attorney to direct Retrolock's mail to Sallyport to collect any checks payable to Sallyport, including any IRS tax refunds.**

As the winter led to spring of 2022, Retrolock's financial condition deteriorated further.  On April 29, 2022, Sallyport exercised its power of attorney under Section 8 of the Factoring Agreement to notify the U.S. Postal Service that Retrolock's mail should be delivered to Sallyport.

---

[6] The term "Operative Documents" was defined in the Forbearance Agreement.

*See* Exhibit 8 to the Hart Declaration.  That was done, in part, to make sure that any mail sending payments on account receivables or other forms of Collateral (e.g., the ERTC refunds) would come to Sallyport. *Id.* at ¶ 34.

As Sallyport became aware that joint checks were being issued, Sallyport adjusted/charged-back the accounts receivable to Retrolock, thereby increasing the over-advance. *Id.* at ¶ 28.  Additionally, Sallyport notified Retrolock that it needed to re-purchase the disputed accounts receivable, by way of a letter notifying Retrolock of its default and demanding payment in full of all obligations due.  *Id.* at ¶ 42; Exhibit 16.

**14. To frustrate Sallyport's ability to collect checks, including any coming from the IRS, Retrolock interfered with Sallyport's right to receive Retrolock's mail and switched its address with the Post Office and the IRS.**

Despite Retrolock having given Sallyport an irrevocable right to change Retrolock's mailing address to ensure that payments would come to Sallyport, Retrolock instructed the Postal Service to change the address from the one Sallyport had given to the Postal Service.  Sallyport's Emma Hart learned this on June 17, 2022.  *Id.* at ¶ 36.  Sallyport received the following email from Retrolock on June 17, 2022:

> Since Sallyport has put us in default, we are noticing Sallyport and Counsel that the power of attorney is rescinded and no longer valid.  Additionally, all mail that this being forwarded from Retrolock is hereby directed to stop.  Sallyport no longer has authorization.  Do NOT forward mail or open mail and power of attorney is rescinded.

*See* Exhibit 10 to the Hart Declaration.

Following receipt of this  email, Sallyport went back online to the U.S. Postal Service website and electronically changed Retrolock's address to Sallyport's.  The Postal Service acknowledged the change.  *Id.* at ¶ 37; Exhibit 11.

Recognizing that the IRS would eventually mail checks for the ERTC refunds, Retrolock went beyond the Postal Service to undo the change of address Sallyport had filed with the Postal Service under the irrevocable power of attorney.  Retrolock went directly to the IRS and changed its address to an address currently unknown to Sallyport.  Sallyport learned of Retrolock's interference when Sallyport received the following in the mail from the IRS at the address Sallyport had provided the Postal Service for Retrolock:

> We changed your mailing address.  We updated your mailing address in our records because the address entered on a tax return or Form 8822-B was different from the one in our records.  We will no longer mail notices and letters to the address above. In addition, we sent an address confirmation to your new mailing address.

*See* Hart Declaration at ¶ 38; Exhibit 12.

Frustrated with Retrolock's interference, Sallyport's Emma Hart emailed Retrolock's Aaron Smith about this on July 13, 2022 stating:

> Aaron
>
> You have changed the address with the IRS for the ERTC checks, the only reason for that is to circumvent the checks coming to Sallyport to repay some of your obligation as promised through the Forbearance agreement as well as multiple conversations. You have attempted to cancel the mail redirect to us that you agreed to, you have tried to do a secret deal with O'Neill to obtain $250k to again circumvent your obligation to Sallyport, despite assuring us that nothing was payable by ANY of your debtors inc O'Neill, on the same weekend that you did your 'deal', and yet you still come out with diatribe that does nothing but serve your purpose of apportioning blame and denying any and all responsibility for this situation.
>
> Tania, are you seriously complicit in all of these actions as it is your name on the door here? You have a fiduciary responsibility to Sallyport as senior secured creditor as well as other creditors.
>
> If there is no prospect of a recovery from the [Employee Retention Tax Credits] payments because you have deliberately diverted those payments then there is zero chance of an ADP payment from Sallyport to repay your obligation to ADP.[7]

---

[7] ADP stands for the payroll service Retrolock was using to pay its employees.

13

You owe us over $6mm - your actions are unbelievable and rest assured, our patience has diminished. We have NEVER worked with individuals that not only have caused a $6mm shortfall, but are also doing everything in their power to ensure a zero recovery to their lender but are trying to line their own pocket with any possible recoveries.

Steve, please prepare the lawsuit – we are done![8]

*See* Hart Declaration at ¶ 39; Exhibit 13.

**15. Retrolock admitted its business was "closed" and that it was "broke."**

On September 29, 2022, after this lawsuit was filed, Retrolock's Emma Hart received an

email from Retrolock's Tomyn stating as follows:

Good evening Emma,

Retro lock is closed. If you need our assistance, then a lawsuit should not have been filed. We have no resources, no funds, and will not be responding. You have advised all clients that you are inaccurately the "Power of Attorney" even though your attorney has not been able to provide proof of this and that you are handling all AR.

Warmest regards
Tania Tomyn, CEO

*See* Hart Declaration at ¶ 41; Exhibit 14.

That same day, Ms. Hart received an email from Retrolock's Aaron Smith stating:

Yeah right. We are broke and we don't have any resources. Any time you need of ours needs to be paid if you want our help collecting. Until terms agreed to we will not do anything.

Aaron Smith

*See* Hart Declaration at ¶ 41; Exhibit 15.

---

[8] The reference to Steve is the undersigned attorney in charge for Sallyport.

## STANDARD OF REVIEW

The standard for issuing a temporary restraining order is the same as the standard for issuing a preliminary injunction. *See Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987). Injunctive relief is "an extraordinary remedy" that may be awarded only upon "a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22, 129 S.Ct. 365, 376, 172 L.Ed.2d 249 (2008). "[S]uch extraordinary relief would issue only where (1) there is a substantial likelihood that the movant will prevail on the merits; (2) there is a substantial threat that irreparable harm will result if the injunction is not granted; (3) the threatened injury outweighs the threatened harm to the defendant; and (4) the granting of the preliminary injunction will not disserve the public interest." *Clark*, 812 F.2d at 993. "The party seeking such relief must satisfy a cumulative burden of proving each of the four elements enumerated before a temporary restraining order or preliminary injunction can be granted." *Id*. But "none of the four prerequisites has a fixed quantitative value." *State of Tex. v. Seatrain Int'l, S. A*., 518 F.2d 175, 180 (5th Cir. 1975). "Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *Id*. (citing *Siff v. State Democratic Exec. Comm*., 500 F.2d 1307 (5th Cir. 1974)).

## ARGUMENT

1. **Sallyport has a substantial likelihood of prevailing on the merits.**

   A. **Retrolock, ATI, Tomyn, and Smith admit the debt to Sallyport exceeds $4.5 million.**

In the Forbearance Agreement, Retrolock and the other defendants admitted that events of default had occurred, that Retrolock's customers' set offs had caused Retrolock to lack sufficient funds to cover its expenses and obligations to Sallyport, and that the outstanding balance owed to

Sallyport as of January 12, 2022 was in excess of $4.5 million.  That amount has only grown since then.  Sallyport's business records reflect that it continued to buy Retrolock's receivables that have proved to be uncollectable.  Pursuant to Section 2.6 of the Factoring Agreement, Sallyport requested that Retrolock honor its promise to buy back $3,635,610.54 in stale or uncollectible receivables, by way of a letter notifying Retrolock of its default and demanding full payment of all obligations due.  *See* Hart Declaration at ¶ 42; Exhibit 16.  Retrolock has not repaid any of its obligations to Sallyport subsequent to that demand.  In addition, Sallyport advanced $6,085,048.65 toward the purchase of receivables but only was holding unpaid and un-adjusted accounts receivable of $3,635,610.54, meaning that Sallyport overpaid for those receivables – to keep Retrolock afloat – by $2,449,438.11.  The Cash Flow Loan also has an unpaid balance of $124,999.99 as of October 31, 2022, as demonstrated in Sallyport's business records.  *See* Hart Declaration at ¶ 50.

### B. Retrolock's debt to Sallyport is secured by Retrolock's and ATI's "general intangibles."

Section 9.203 of the Uniform Commercial Code ("UCC") specifies three steps for a security interest to attach to collateral.

First, the owner of the collateral must sign a security agreement describing the collateral. TEX. BUS. & COMM. CODE § 9.203(b)(2).[9]  Sections 1.12 and 3.1 of the Factoring Agreement satisfy this as they contain a written security agreement describing as collateral for Retrolock's obligations, among other things, Retrolock's "general intangibles."  *See* pages 1 and 4 of Exhibit 1 to the Hart Declaration.  The same applies to Section 25 of ATI's guaranty as it includes a

---

[9] The parties agreed in Section 10.18 of the Factoring Agreement that Texas law would apply.  *See* page 13 of Exhibit 1 to the Hart Declaration.  Similarly, ATI agreed in Section 24 of its guaranty that Texas law would apply. *See* page 65 of Exhibit 1 to the Hart Declaration.

security agreement covering its "general intangibles" to secure its guaranty obligations.  *See* page 65 of Exhibit 1 to the Hart Declaration.

Second, the creditor, Sallyport, must have given value. TEX. BUS. & COMM. CODE § 9.203(b)(1).  Section 2 of the Factoring Agreement and the Cash Flow Addendum satisfy this element as Sallyport committed to purchase receivables from Retrolock, advancing funds toward the purchase of receivables and by advancing funds under such addendum.  *See* pages 3-4 of Exhibit 1, and Exhibit 4, to the Hart Declaration.

Third, the owner (i.e., Retrolock and ATI) must have rights in the collateral. TEX. BUS. & COMM. CODE § 9.203(b)(2).  The right to a tax refund is an intangible property right that belongs to the taxpayer.

### C.  Retrolock's and ATI's Employee Retention Tax Credit refunds are "general intangibles."

Section 9.102(42) of the UCC defines "general intangible" to mean "any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas, or other minerals before extraction.  The term includes payment intangibles and software." TEX. BUS. & COMM. CODE § 9.102(42).

Cases construing "general intangibles" under the Uniform Commercial Code have concluded that "general intangibles" include federal tax refunds.  *See Kelly v. Hickman*, No: 21cv1226-BEN-MDD, 2021 WL 4473177 at *3 (S.D. Cal. Sept. 30, 2021) (citing *In re TMCI Elecs*., 279 B.R. 552, 555 (N.D. Cal. 1999)) ("It is well accepted that the right to receive a tax refund constitutes a 'general intangible'"); *In re American Home Furnishings Corp*., 48 B.R. 905, 908 (W.D. Wash. 1985) ("Tax refunds are general intangibles, not contract rights"); *In re Metric Metals Int'l, Inc*., 20 B.R. 633, 636 (S.D.N.Y. 1981) ("[T]he cases and commentators that have

addressed the question agree that tax refunds constitute general intangibles as defined in the [UCC]"); *In re Kendrick and King Lumber, Inc*., 14 B.R. 764, 766 (Bankr. W.D. Okla.1981); *In re Kingswood*, 343 F.Supp. 498 (C.D. Cal. 1972); *In re Scherbenske Excavating, Inc*., 38 B.R. 84, 87-88 (Bankr. D.N.D.1984); *In re TWI, Inc*., 39 U.C.C.Rep.Serv. 1031, 1033 (4th Cir. 1984) (unpublished).

The "general intangible" here is the ERTC refund.  ERTC refunds first became available when Congress enacted Section 2301 of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") in 2020 in response to the Covid-19 pandemic. Pub. L. No. 116-136, 134 Stat. 281, § 2301.  Congress confirmed, retroactively, the refundability of such tax credits in 2021 in the American Rescue Plan Act of 2021.  Pub. L. No. 117-2, 135 Stat. 4, § 9651; *see also* Temporary Income Tax Regulation, 86 Fed. Reg. 50637 (Sept. 20, 2021).

Accordingly, Sallyport has a security interest in any tax refunds due Retrolock and due ATI.  This includes any IRS checks or direct deposits of such refunds.

## 2. Sallyport will suffer irreparable harm if injunctive relief is not granted.

Retrolock's only remaining asset is the $2.1 million ERTC refund, and ATI's only remaining asset is the $1.4 million ERTC refund.  If that collateral is not frozen pending final judgment in this case, Sallyport's eventual monetary judgment will be a hollow victory.  Retrolock's conduct demonstrates it has no regard for preserving collateral of Sallyport.  Since Tomyn is the principal behind Retrolock and ATI, Sallyport has no reason to believe that ATI would treat its refund any differently than Retrolock.

**A. Money damages are not an adequate remedy where the defendant is already insolvent.**

In a well-reasoned opinion, Chief Judge Rosenthal concluded that a preliminary injunction freezing an asset pending the outcome of a claim for damages is proper where the defendant is likely to become insolvent before judgment. *Amegy Bank, N. A. v. Monarch Flight II, LLC,* No. H-11-3218, 2011 WL 6091807 at *6-7 (S.D. Tex. Dec. 7, 2011). Here Retrolock is already insolvent as it admits it is "broke." Judge Rosenthal held in *Amegy Bank*:

> In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir.2011). "Where the harm suffered by the moving party may be compensated by an award of money damages at judgment, courts generally have refused to find that harm irreparable." *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir.1994). "**However, the mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate.'** *Janvey*, 647 F.3d at 600. **Even when, as here, the ultimate relief sought is money damages, "extraordinary circumstances" such as evidence showing that the defendant is likely to become insolvent before final judgment or that defendant intends to dissipate his assets to make a judgment awarding damages uncollectible** – "**may give rise to the irreparable harm required for a preliminary injunction."** *Hughes Network*, 17 F. 3d at 694; *see also Pashatan v. Eccelston Props., Ltd.*, 88 F.3d 77, 86-87 (2d Cir. 1996). The Supreme Court has emphasized that "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is likely in the absence of an injunction." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed. 249 (2008). …
>
> On the current record, **Amegy has shown that it is likely Johnson will lack sufficient assets at the end of the litigation to satisfy a final judgment awarding damages**. ... Amegy has shown that it is entitled to a preliminary injunction freezing the real properties that Johnson improved or benefitted using the proceeds of the partnership units sale. The injunction will prevent him from transferring, selling, or further encumbering them.

*Id*. (emphasis added).

Sallyport's case is more compelling than *Amegy Bank*. In *Amegy Bank*, the assets frozen by the Court were not then serving as collateral for the debt upon which Amegy Bank sued. Here, the asset sought to be frozen is Sallyport's collateral.

19

More importantly, Retrolock admits it is "broke" and its only remaining asset is a tax refund – part of Sallyport's collateral – that it could receive at any time and spend before Sallyport can obtain a judgment.  Retrolock showed its hand when it interfered with its promise that Sallyport could receive Retrolock's mail after default and changed its address with the Postal Service and the IRS.  Without Defendants being enjoined from using, spending, or dissipating the ERTC refunds, Sallyport's eventual judgment will be uncollectible.

### B. Garnishment of the IRS to trap Retrolock's and ATI's Employee Retention Tax Credit refunds is not an available remedy because the IRS is immune from garnishment writs.

A pre-judgment garnishment of the IRS is not an available prejudgment remedy to Sallyport as the IRS is immune from garnishment.  *Skoreychenko v. Tompkins*, No. 08-CV-626-bbc, 2010 WL 138385 at *1 (W.D. Wis. Jan. 12, 2010) ("The doctrine of sovereign immunity protects the United States from suit by judgment creditors seeking to garnish or attach property within the federal government's control"); *Brockelman v. Brockelman*, 478 F. Supp. 141, 142 (D. Kan. 1979) (same).[10]  Accordingly, without enjoining Retrolock and ATI from spending or dissipating the ERTC refunds, Sallyport will be left with no remedy at the end of this case.

### C. Neither pre-judgment sequestration nor attachment are available remedies as both are limited to tangible property, and the Employee Retention Tax Credit refunds are intangible.

If collateral is in physical or tangible form, the Texas prejudgment statutory remedy for sequestration is available. *See* Tex. Bus. & Comm. Code § 62.001, *et. seq.*[11]  "Sequestration

---

[10] Through legislation, the IRS has waived immunity to garnishments for child support and alimony.  *See* 42 U.S.C. § 659.

[11]  Federal courts may exercise every remedy available under the law of the state where the court is located, including remedies providing for the seizure of property to secure satisfaction of a potential judgment. FED. R. CIV. P. Rule 64.

initializes judicial enforcement of a contractual security interest by attempting to obtain *physical possession* of collateral while the suit is pending and to satisfy the secured debt through it after judgment."  Atkins, B. "Prejudgment Remedies", 32 THE ADVOC. (TEXAS) 15 (Fall 2005).

Here, the collateral is "intangible" – it is merely Retrolock's and ATI's legal right to receive funds from the IRS.  One cannot take physical possession of intangible property, so sequestration is not a remedy in this case.

Similarly, when there is no collateral, the Texas prejudgment remedy of attachment is available.[12]  *Id*. at 23. But like sequestration, attachment may only be used to seize tangible property.  A writ of attachment may only be levied, pre-judgment, on property that can be reached by execution. TEX. CIV. PRAC. & REM. CODE § 61.041.  A marshal may not "execute" on intangible property.

Accordingly, neither sequestration nor attachment are available remedies.

### 3. The harm of not freezing the Employee Retention Tax Credit refund outweighs any harm to Retrolock as Retrolock admits its business is closed.

Retrolock was based in Southern California.  It has vacated all of its locations there.  It disposed of all of its equipment in June 2022.  Its principals, Tania Tomyn and Aaron Smith, fled California for Florida.  It admits its business is closed and admits that it is broke.  Hart Declaration at ¶¶ 35, 40, 41.  Compared with the harm Sallyport will suffer if temporary and preliminary injunctive relief is denied as described above, any harm to Retrolock is clearly outweighed by the harm to Sallyport.

---

[12] With tangible property, sequestration is used when the petitioning creditor has a security interest in the tangible property to be sequestered, and attachment is used when the petitioning creditor lacks a security interest in the tangible property to be attached.

**4. Issuing temporary and preliminary injunctive relief will not impact public interests.**

As this is a private dispute between Sallyport and Retrolock and the other Defendants, the temporary and preliminary injunctive relief requested has no impact on the public. *See A.T.N. Industries v. Gross*, 622 Fed. Appx. 185, 191 (5th Cir. 2015) (upholding district court's preliminary injunction freezing defendant's access to certain funds pending trial on the merits, concluding that such injunction was not against public interests).

**CONCLUSION**

To prevent dissipation of Retrolock's and ATI's sole remaining assets – approximately $2.1 million in federal tax refunds the IRS owes Retrolock and $1.4 million in federal tax refunds the IRS owes ATI, in which Sallyport has security interests – the Court should temporarily restrain and preliminarily enjoin Retrolock, ATI, their principals, Tania Tomyn and Aaron Smith, and those acting in concert with them, from cashing, negotiating, depositing, transferring, assigning or otherwise alienating any check which they receive from the United States Treasury or the Internal Revenue Service issued to Retrolock or ATI for such refunds, and ordering them to notify Sallyport, and its counsel, in writing upon Retrolock's and/or ATI's receipt of such refunds.

Of Counsel:
LEVINSON, ARSHONSKY &
KURTZ, LLP

Walter J. Sawicki
California Bar No. 223541
Admitted Pro Hac Vice
LEVINSON, ARSHONSKY &
KURTZ, LLP
15303 Ventura Blvd., Suite 1650
Sherman Oaks, CA 91403
Tel.: (818) 382-3434
Fax: (818) 382-3433
Email: wsawicki@laklawyers.com

Trent L. Rosenthal
Rosenthal Law Firm, PLLC
Texas Bar No. 17282300
Southern District ID No. 29
ROSENTHAL LAW FIRM, P.L.L.C.
trosenthal@rosenthallaw.com
675 Bering Drive, Suite 150
Houston, Texas 77057
Tel: (713) 647-8177
Fax: (713) 647-8127
Email: trosenthal@rosenthallaw.com

Respectfully submitted,


/s/ Steven N. Kurtz
Steven N. Kurtz
Attorney-in-Charge
Admitted Pro Hac Vice
California Bar No. 125972
Email: skurtz@laklawyers.com
15303 Ventura Blvd., Suite 1650
Sherman Oaks, CA 91403
Tel.: (818) 382-3434
Fax: (818) 382-3433

**Attorney in Charge for**
**Plaintiff Sallyport Commercial Finance, LLP**


## CERTIFICATE OF CONFERENCE

On November 14, 2022 at approximately 10:30 a.m., Pacific Time, the undersigned counsel

for Sallyport conferred with counsel for Defendants regarding the relief requested in this motion

and requested that the Defendants agree thereafter to the entry of a Temporary Restraining

Order/Preliminary Injunction.   A Order for same was thereafter provided to counsel for

Defendants.  Counsel for Defendants advised that he needed to discuss the matter with his clients,

expressed concerns for his clients' potential personal liability for unpaid payroll taxes, and said

that he believes that there may be tax liens senior to Sallyport's lien (which Sallyport disputes).  I

informed counsel that I would serve him with the TRO papers.  I was told that opposing counsel is available for a conference depending upon when the conference is scheduled.  That same day at 4:00 p.m., Pacific Time, Mr. Van called me again about the TRO matter.  Mr. Van requested that we wait two days to file the TRO papers because he was busy with matters regarding the wind down of his old law firm and wanted his client to obtain additional and/or new counsel.  I told Mr. Van that I did not have authority to hold off filing the TRO papers because I did not trust his clients to hold approximately $3.5 million in tax refunds in trust for Sallyport if the money was received while our client held off on filing the accompanying papers.

      */s/ Steven N. Kurtz*
Steven N. Kurtz

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of November, 2022, a true and correct copy of the foregoing documents was served via the Court's electronic filing program, pursuant to the Texas Rules of Civil Procedure on all counsel of record.

*/s/ Steven N. Kurtz*
Steven N. Kurtz