# EXHIBIT "A"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| SALLYPORT COMMERCIAL FINANCE, LLC, a Delaware Limited Liability Company, §§§ | |
| Plaintiff, §§ | |
| v. § | Civil Action No. 4:22-CV-02872 |
| RETROLOCK COROPORATION, a California corporation, TANIA TOMYN, an individual, AARON SMITH, an individual, and AT INSTALLATION, INC., a California corporation §§§§§§ | |
| Defendants. §§ | |

### EMMA HART'S DECLARATION

Pursuant to 28 U.S.C. § 1746, I declare as follows:

1.      My name is Emma Hart.  I am over the age of 18 years and am competent to testify herein.  I have personal knowledge of the facts stated herein, and they are true and correct.

2.      Since July of 2014, I have been Executive Vice President of Sallyport Commercial Finance, LLC ("Sallyport").

3.      With respect to Sallyport's citizenship, Sallyport's primary office is in Sugar Land, Texas at 14100 Southwest Freeway, Suite 210, Sugar Land, Texas.  Sallyport is organized as a Delaware limited liability company.  Sallyport has three members: (1) Sallyport Holdings LLC, which is a Delaware limited liability company ("SPH"); (2) my spouse, Nicholas Hart, who resides with me in Houston, Texas; and (3) me.  SPH has four members: (1) Sallyport Investments, LLC, which is a Texas limited liability company ("SIL"); (2) a private trust called Kyle E Bethancourt Trust, the trustee of which is Kyle Bethancourt, who resides in Houston, Texas, and the

beneficiaries of which are minors who reside in Houston, Texas; (3) Kyle Bethancourt who resides in Houston, Texas; and (4) Drew Carden who resides in Houston, Texas.  SIL is a Texas limited liability company, and its sole member is Douglas Foshee who resides in Houston, Texas.

4.      With respect to the citizenship of the Defendants, Retrolock Corporation ("Retrolock") represented itself to Sallyport to be a California corporation, with its offices located at (1) 210 W. Taft Avenue in Orange, California, a suburb southwest of Los Angeles and (2) 1943 Rutan Drive, Livermore, California, which is just east of Oakland.  This and other representations were contained in an Account Sale and Purchase Agreement to which Retrolock agreed with Sallyport on June 18, 2021 (for brevity, the "Factoring Agreement"). Attached hereto as Exhibit 1 is a true and correct copy of the Factoring Agreement, with redactions for driver's license numbers, bank account numbers, and other sensitive and proprietary information (such as fees charged)[1], along with other related documents executed concurrently therewith, including guaranties entered into by the other Defendants (collectively called the "Factoring Documents").  The representations as to Retrolock's offices will be found at page 1 of the Factoring Documents, Exhibit 1 hereto.[2]

5.      As for Defendants Tania Tomyn ("Tomyn") and Aaron Smith ("Smith"), each represented themselves to Sallyport as having driver's licenses issued by the State of California bearing residential addresses in Fullerton, California (as to Tomyn) and Laguna Beach, California (as to Smith).   Copies of their driver's licenses (with license numbers redacted) may be found on pages 42 and 55 of the Factoring Documents, Exhibit 1 hereto.

6.      As for Defendant AT Installation, Inc. ("ATI"), ATI represented itself to Sallyport as being a California Corporation with its office at 111E Katella Avenue, Suite 230, Orange,

---

[1] An unredacted version of the Factoring Agreement will be provided to the Court, upon request, for *in camera* review.
[2] A page number reference to the Factoring Documents (Exhibit 1) shall mean a reference to the Bates-stamped page number on the bottom right corner of the document.

California.  Copies of ATI's corporate resolution making such representation may be found at page 68 of the Factoring Documents, Exhibit 1 hereto.

7.      Sallyport is in the factoring business.  Generally, Sallyport provides working capital to its clients by agreeing to purchase, at a discount, some or all of a client's accounts receivables for goods and/or services a client has provided to its customers.  Generally, factoring provides a client with upfront cash, so a client does not have to wait for its customers to pay for the goods and/or services provided to such customers.  In turn, the client's customers are typically instructed by the client and Sallyport to pay Sallyport the amount of the client's invoice for the goods and services.  The terms and conditions under which Sallyport agrees to purchase accounts receivable from its clients is typically set forth in a written agreement.  And sometimes, under certain circumstances, Sallyport agrees to provide working capital to its clients by providing loans to the client.  When and if Sallyport agrees to provide a loan to its client, the lending terms are set forth in a written supplement to any agreement Sallyport has made with respect to purchasing the client's accounts receivable.

8.      To mitigate the risk of non-payment, Sallyport requires collateral and guaranties from the client's principals as well as warranties, representations, and covenants regarding the client's business and conduct.  For example, Sallyport commonly requires its clients provide a security interest under the Uniform Commercial Code in all of the client's accounts (whether or not purchased by Sallyport from the client), equipment, general intangibles (such as federal income tax refunds and tax credits), electronic chattel paper, inventory and equipment, and many other forms of personal property, including the proceeds from their disposition.  Sallyport also commonly requires personal written guaranties from the principals of its client, as well as related financially responsible individuals and third parties, and sometimes requires those guarantors to

provide a security interest in various forms of property to secure their obligations as guarantors. Sallyport also commonly requires various warranties, representations, and covenants with regard to the client's business conditions, operations, and solvency.

9.      In early June 2021, Sallyport received a phone call from Jim Cortens, a business consultant engaged by Retrolock, seeking a working capital facility for Retrolock, a business located in southern California in immediate need of working capital to meet its ongoing obligations.  Cortens described Retrolock as being in the construction business, specializing in interior finishes, sale and installation of specialty doors, mill work, and decorative metals and finish carpentry.  Sallyport was advised that ATI, an affiliate of Retrolock (owned by Tomyn), was used to provide sub-contracted union labor for jobs requiring that union labor be used.

10.      After Jim Cortens provided some initial financial information, Sallyport provided a proposal to Retrolock. Retrolock accepted the proposal and on June 18, 2021, Sallyport entered into a factoring arrangement with Retrolock in a document entitled "Account Sale and Purchase Agreement," Exhibit 1 hereto.  The copy attached contains the redactions described in paragraph 4 above.  ATI, Tomyn, and Smith guaranteed the obligations owing to Sallyport under the Factoring Agreement pursuant to written Guaranty Agreements. *See* pages 31, 44, and 57 of the Factoring Documents, Exhibit 1 hereto.

11.      Section 2.1 of the Factoring Agreement gave Sallyport an exclusive right to purchase accounts receivables from Retrolock but also gave Sallyport sole discretion as to whether to purchase a receivable. *See* page 3 of Exhibit 1 hereto. Section 2.1 of the Factoring Agreement also provides that unless Sallyport notified Retrolock to the contrary as to a specific account receivable, all account receivables would be deemed purchased by Sallyport upon presentment to Sallyport by Retrolock.

4

12.     Section 2.2 of the Factoring Agreement addressed the purchase price to be paid for each receivable Sallyport elected to purchase and gave Sallyport the discretion either to wait to pay the price in full at such time as Sallyport received payment of the invoice from Retrolock's client or to advance a portion of the purchase price while awaiting payment of the invoice by Retrolock's client.  Significantly, however, Retrolock agreed in Section 2.2 of the Factoring Agreement that Sallyport was excused from advancing any more, in the aggregate, toward the purchase price of account receivables than the "Maximum Facility Limit Amount" which was initially set in Section 1.24 of the Factoring Agreement and in line no. 9 in Schedule A to the Factoring Agreement at $1.5 million.  *See* pages 2 and 16 of Exhibit 1 hereto.

13.     Section 4 of the Factoring Agreement contained Retrolock's continuing warranties and representations to Sallyport about its business and activities.  These include Section 4.4 (in which Retrolock warranted and represented to Sallyport that it would provide Sallyport 30 days' advanced written notice of the moving of any Collateral from the addresses specified in the Factoring Agreement), Section 4.6 (in which Retrolock warranted and represented that every account receivable Retrolock assigned to Sallyport represented an undisputed bona fide existing unconditional obligation of Retrolock's customer), and Section 4.10 (in which Retrolock warranted that it was and would remain solvent, and that such warranty and representation would be deemed to be breached if at any time Sallyport estimated that the value of Retrolock's assets, if sold in bulk for liquidation purposes, would not be sufficient to pay the total of Retrolock's liabilities).

14.     To mitigate the risk that Retrolock's customers would fail to pay an account receivable Sallyport purchased from Retrolock and the risk that Retrolock would not honor its

promise to repurchase an account receivable from Sallyport, the Factoring Agreement contained four other key protections for Sallyport.

15.     First, Section 3 of the Factoring Agreement provided that Sallyport had a continuing security interest in "Collateral" to secure all of Retrolock's "Obligations" to Sallyport. *See* page 4 of Exhibit 1 hereto.  Section 1.2 of the Factoring Agreement defined "Collateral" to include, among other things, all of Retrolock's then owned or thereafter acquired accounts, equipment, inventory, financial assets, and general intangibles. *See* page 1 of Exhibit 1 hereto. Sallyport filed Uniform Commercial Code Financing Statements with the Secretary of State of the State of California relating to Retrolock and ATI, certified copies of which are attached hereto collectively as Exhibit 2 and incorporated herein by reference.  Attached hereto as Exhibit 3 is a true and correct copy of a letter from Corporation Service Company confirming it filed the Financing Statements on behalf of Sallyport and was representing Sallyport as the secured party of record.  Section 1.29 of the Factoring Agreement defined "Obligations" to mean and include the following:

> each and all of the following: the obligation to pay and perform when due all debts and all obligations, liabilities, covenants, agreements, guaranties, warranties and representations of [Retrolock] to [Sallyport], of any and every kind and nature, whether heretofore, now or hereafter owing, arising, due or payable from [Retrolock] to [Sallyport]; howsoever created, incurred, acquired, arising or evidenced; whether primary, secondary, direct, absolute, contingent, fixed, secured, unsecured, or otherwise; whether as principal or guarantor; liquidated or unliquidated; certain or uncertain; determined or undetermined; due or to become due; as a result of present or future advances or otherwise; joint or individual; pursuant to or caused by [Retrolock]'s breach of this Agreement, or any other present or future agreement or instrument, or created by operation of law or otherwise; evidenced by a written instrument or oral; created directly between [Sallyport] and [Retrolock] or owed by [Retrolock] to a third party and acquired by [Sallyport] from such third party; monetary or nonmonetary.

*See* page 2 of Exhibit 1 hereto.

6

16.     Second, Sallyport obtained the personal written guaranties of all of Retrolock's obligations to Sallyport from Tania Tomyn, Aaron Smith, and ATI.  True and correct copies of these guaranties are part of the Factoring Documents and are incorporated herein by reference. *See* pages 31, 44, and 57 of Exhibit 1.

17.     Third, Section 25 of ATI's guaranty provided as follows: "This Guaranty is secured by the following: All of [ATI's] now owned or hereafter acquired… General Intangibles… and all proceeds of the foregoing."  *See* page 65 of Exhibit 1 hereto.

18.     Fourth, Section 2.5 of the Factoring Agreement established a "reserve," thereby mitigating Sallyport's exposure for payment of the full purchase price for a receivable before the client's customer had an opportunity to object to or pay an invoice on an account receivable purchased by Sallyport.   The "reserve" was defined in Section 1.38 of the Factoring Agreement as a bookkeeping account on Sallyport's accounting records representing the unpaid portion of the purchase price for each account receivable Sallyport had agreed to purchase from Retrolock ("Reserve Account").   *See* Page 2 of Exhibit 1 hereto.  The "reserve" served two purposes.  One was to protect Sallyport from paying the face amount of receivables purchased while Retrolock still had financial obligations to Sallyport for fees, any failures to buy back disputed customer invoices, or other financial obligations under the Factoring Agreement to Sallyport.  Second, the "reserve" was a source of reserved credit from which Sallyport, in its sole discretion, as provided in Section 2.5 of the Factoring Agreement, could advance as cash to Retrolock in anticipation of future account receivables Sallyport might purchase, provided there were no then existing events of default under the Factoring Agreement.  Significantly, the Factoring Agreement specifically provided that the maintenance of the "reserve" did "not vest [Retrolock] with any right, title, or interest" in such account.

19.     Fifth, Section 2.6 gave Sallyport the right to require Retrolock to repurchase any account receivable Sallyport purchased from Retrolock upon the following events: (a) an account receivable was not paid by Retrolock's customer within ninety (90) days of the date set forth on the invoice for the purchased account; (b) Retrolock had breached any warranties or promises in the Factoring Agreement with regard to an unpaid receivable; (c) Retrolock and its customer were involved in a dispute of any kind, regardless of validity; (d) Retrolock's customer asserted a claim or loss of any kind against Retrolock and/or Sallyport; and/or (e) an insolvency or other financial inability of the customer to pay.

20.     To mitigate the risk that Retrolock might one day default and thereafter interfere with Sallyport's collection of accounts receivable it had purchased or were serving as collateral for Retrolock's obligations to Sallyport, Sallyport obtained an irrevocable power of attorney from Retrolock in Section 8 of the Factoring Agreement to direct Retrolock's mail to Sallyport.  Section 8 (*see* pages 10-11 of Exhibit 1 hereto) states in relevant part as follows:

> Power of Attorney. [Retrolock] grants to [Sallyport] an irrevocable power of attorney coupled with an interest authorizing and permitting [Sallyport] (acting through any of its employees, attorneys or agents) at any time, at its option but without obligation, with or without notice to [Retrolock], and at [Retrolock]'s sole expense, to do any or all of the following, in [Retrolock]'s name or otherwise: … (e) upon the occurrence of any Event of Default, to receive and open all mail addressed to [Retrolock]; and, in the exercise of such right, [Sallyport] shall have the right, in the name of [Retrolock], to notify the Post Office authorities to change the address for the delivery of mail addressed to [Retrolock] to such other address as [Sallyport] may designate, including, but not limited to, [Sallyport]'s own address; [Sallyport] shall turn over to [Retrolock] all of such mail not relating to the Collateral; such right to redirect mail granted to [Sallyport] is irrevocable and [Retrolock] shall not have the right to notify the Post Office to change the address for delivery after [Sallyport] has exercised such right… .

21.     On June 18, 2021, Sallyport purchased approximately $8.9 million in Retrolock's accounts receivable, and advanced to Retrolock $1.5 million consistent with the $1.5 million initial maximum funding limit.   On July 16, 2021, Sallyport agreed to increase the maximum Facility

Limit Amount of the Factoring Agreement to $5 million.  Sallyport's purchases of Retrolock's accounts receivable (by dollar amount) are reflected in Exhibits 19 and 20 discussed below. Sallyport's advances toward the purchase price for such accounts receivable (by dollar amount) are also reflected in Exhibits 19 and 20.

22.     In late September 2021, I was informed that Retrolock and ATI needed further, additional working capital to keep its doors open to pay urgent vendors, payroll, quarterly employment taxes, and complete projects, particularly those representing receivables which Sallyport had either purchased or were serving as collateral for Retrolock's obligations to Sallyport under the Factoring Agreement.  If Sallyport did not provide Retrolock with funds to keep its doors open and allow it to complete performance, there was little, if any, likelihood of Sallyport being paid on those purchased receivables.

23.     To provide the additional working capital requested by Retrolock, Sallyport agreed to provide a term loan to Retrolock of up to $500,000.00 and set forth the terms of such loan agreement in writing in a document called Cash Flow Addendum to Account Sale and Purchase Agreement, a true and correct copy of which is attached hereto as Exhibit 4 and incorporated herein (for brevity, this is called the "Cash Flow Addendum" in this Declaration).  The Cash Flow Addendum was agreed to as of September 30, 2021.

24.     Advances under the Cash Flow Addendum to Retrolock were at Sallyport's sole discretion.  *See* paragraph 2 on Page 1 of Exhibit 4.   Retrolock's promise to repay the loan with interest is set forth in paragraphs 3 and 5 of the Cash Flow Addendum.  Retrolock's promise to repay funds advanced to it under the Cash Flow Addendum were part of "Obligations" set forth in the Factoring Agreement and were "secured by the Collateral pursuant to the terms of the [Factoring Agreement]."  *See* Paragraph 4 on Page 1 of Exhibit 4.   They would also be covered

by the written guaranties set forth in Exhibit 1 as each guaranty recited in Paragraph 1 that each "Guarantor hereby unconditionally guarantees and promise to pay on demand to Sallyport …. all Indebtedness of [Retrolock] now or hereafter owing to Sallyport." *See* pages 31, 44, and 57 of Exhibit 1.  In turn "Indebtedness" is defined in each guaranty to mean and include "any and all debts … of [Retrolock] …to Sallyport… ." *See* pages 31, 44, and 57 of Exhibit 1.

25.     On September 30, 2021, Sallyport advanced $500,000 to Retrolock on the Cash Flow Addendum Loan, less fees and repayment of a small prior advance as reflected in Exhibit 4.

26.     Although Sallyport was generally collecting payments on accounts receivable it had agreed to purchase from Retrolock through October 2021, by early November 2021 Sallyport learned that a number of Retrolock's customers had decided to offer payment towards several very large receivables for a construction project by making its checks jointly payable to Retrolock and other vendors to Retrolock.  In other words, the checks would not, and did not, come to Sallyport as called for on all customer payments on receivables Sallyport purchased, but Retrolock endorsed the checks over to the vendors instead.  The situation deteriorated further throughout November and December of 2021.  Meanwhile Retrolock's Tania Tomyn and Aaron Smith continued to ask for additional working capital to meet its weekly payroll to keep its employees working to finish existing projects forming the basis of receivables Sallyport had purchased.

27.     On December 14, 2021, I visited Retrolock to discuss the account as Retrolock was in default under the terms of the Factoring Agreement and the Cash Flow Addendum in the following ways.  First, although Retrolock had warranted and represented to Sallyport in Section 4.6 of the Factoring Agreement that each account receivable presented to Sallyport for purchase represented a valid, undisputed receivable in which Retrolock's customer had accepted the goods sold and/or services provided without deduction or offset – *see* page 5 of Exhibit 1 – Retrolock's

customers were disputing Retrolock's invoices because Retrolock had failed to pay its vendors and other third parties, thereby jeopardizing the customer's construction projects. Other Retrolock customers refused to pay invoices in their entirety. Second, Retrolock's Tania Tomyn and Aaron Smith reported to me that without even more working capital, Retrolock would not be able to pay its obligations as they were coming due, which would jeopardize Sallyport's ability to collect the account receivables it had purchased from Retrolock. Additionally, Tania Tomyn and Aaron Smith informed me that they were expecting an Economic Injury Disaster Loan from the SBA in the amount of $350,000 to be funded imminently as part of the SBA's Covid related programs, and Employee Retention Tax Credit ("ERTC") refunds of approximately $2,600,000 was due as a refund from the IRS to Retrolock, so the continuing support of Sallyport was critical and would be repaid once the above were received. The ERTC was a tax credit/refund created as part of certain laws and regulations related to assisting businesses through the Covid-19 pandemic. I was also informed that an ERTC refund of approximately $1.4 million was due to ATI.

28.    On January 10, 2022, I discussed the account with Tania Tomyn as the accounts receivable continued to deteriorate, and Tania Tomyn informed me that a large customer payment that was expected for $938,000 had been reduced to zero due to joint checks to other vendors of Retrolock and labor unions of ATI. In that same call Tania Tomyn told me that other customers had also reduced their invoices with joint checks such that over $1,600,000 of invoices funded by Sallyport to Retrolock would not be paid to Sallyport as other Retrolock vendors and ATI's unions had not been paid by Retrolock or ATI and these funds had been endorsed over to make such payments. As we became aware that joint checks were being issued, we adjusted/charged-back the accounts receivable to Retrolock, thereby increasing the over-advance. On January 11, 2022, I, along with Nick Hart, had a call with Tania Tomyn and Aaron Smith to further discuss the

11

account. Tania Tomyn and Aaron Smith explained that they must be funded for the payroll for ATI and Retrolock, otherwise they would have to close the doors and Sallyport would not be repaid anything.

29.     Sallyport was prepared to begin legal actions to enforce its remedies under the Factoring Agreement, the security interest therein set forth, and the guaranties.  Retrolock's Aaron Smith told me that if it could have additional time, it could resolve the outstanding issues and get Sallyport paid as the ERTC paperwork that was submitted to the IRS in November 2021 had now been assigned to an IRS agent and payment should be forthcoming.  As a result, on January 12, 2022, Sallyport, Retrolock, Tomyn, Smith, and ATI agreed to the Forbearance Agreement attached hereto as Exhibit 5 and incorporated herein by reference (the "Forbearance Agreement").  So long as Retrolock, Tomyn, Smith, and ATI kept their commitments under the Forbearance Agreement, the Forbearance Agreement provided that Sallyport would forbear from exercising its available remedies against them until June 30, 2022.  *See* Sections 9.1 and 1(k) on pages 3 and 6 of Exhibit 5 hereto.

30.     In the Forbearance Agreement, Retrolock, Tomyn, Smith, and ATI acknowledged and admitted the following:

      a.  all of their obligations to Sallyport, financial and otherwise, under the Factoring Agreement, the Cash Flow Addendum and the Guaranties (i.e., the "Operative Documents," as that term is defined in the Forbearance Agreement); – *see* Pages 1-2 of Exhibit 5;

      b.  the Operative Documents were in full force and effect; – *see* Pages 1-2 of Exhibit 5;

      c.  events of default by Retrolock had occurred under the Factoring Agreement – namely, that Retrolock's customers had set off amounts due on account receivables purchased by Sallyport because of Retrolock's failure to pay Retrolock's vendors and other third parties; – *see* Section I on Page 2 of Exhibit 5;

    d.   Retrolock's customers' set offs caused Retrolock to lack sufficient funds to cover its expenses and other obligations to Sallyport; – *see* Section I on Page 2 of Exhibit 5;

    e.   events of default had occurred under Tomyn, Smith, and ATI's guaranties – namely, failure to pay Sallyport amounts owed by Retrolock to Plaintiff; – *see* Section J on Page 2 of Exhibit 5;

    f.   due to the events of default, all amounts due under the Factoring Agreement, Cash Flow Addendum, and the Guaranties had been accelerated and were then due and owing to Sallyport; – *see* Section K on Page 2 of Exhibit 5;

    g.   the outstanding amount owed to Sallyport on January 12, 2022 – the date of the Forbearance Agreement – was $4,593,998.77, excluding fees incurred under the terms of the Factoring Agreement – *see* Section G on Page 1 of Exhibit 5;

    h.   the incorporation into the Forbearance Agreement of all representations and warranties in the Factoring Agreement, Cash Flow Addendum, and the Guaranties; – *see* Page 1 of Exhibit 5; and

    i.   any future failure to cooperate with Sallyport with respect to the Operative Documents would qualify as an additional event of default – *see* Section 9.11 on Page 8 of Exhibit 5.

Retrolock committed not to commit any further events of default. *See* Section 9.13 on Page 8 of Exhibit 5.

31.    In Section 7.1 of the Forbearance Agreement, Retrolock reaffirmed Sallyport's security interest in its Employee Tax Credit refunds, including an expected approximately $2.6 million Employee Retention Credit from the Internal Revenue Service:

> [Retrolock] hereby reaffirms the granting of, and represents and warrants to Sallyport that Sallyport has, a valid, enforceable and perfected lien on and security interest in all of the Collateral granted by [Retrolock] to Sallyport as security for [Retrolock's] Obligations. The Collateral granted by [Retrolock] to Sallyport as security for [Retrolock's] Obligations secures all of the presently existing and hereafter arising Obligations, of [Retrolock] owing to Sallyport. [Retrolock] reaffirms the assignment of all tax refunds, including, without limitation, the Employee Retention Credit expected to be the approximate amount of $2,600,000.00, shall pay over to Sallyport and shall execute all such documents as reasonably requested by Sallyport to ensure assignment and payment of such tax refunds, ·including, without limitation, the Employee Retention Credit, to Sallyport.

*See* page 5 of Exhibit 5.

32.     In Section 7.2 of the Forbearance Agreement, ATI reaffirmed Sallyport's security interest in its Employee Tax Credit refunds.  *See* page 5 of Exhibit 5.

33.     In February 2021 I visited Retrolock to examine their books and records. When examining the bank statements, I found five high interest loans totaling $2,250,000.00 had been received by Retrolock in the period between September 2021 and February 2022.  These resulted in loan repayments of in excess of $200,000 per month. During that visit, Aaron Smith told me that Tri Counties Bank, which had previously reviewed Retrolock, had contacted him about providing a line of credit and a term loan totaling $8,000,000. Aaron Smith told me the intention was to repay Sallyport in full with the bank loan. I later spoke to an individual at Tri Counties Bank to determine that the bank was actually trying to provide a facility for Retrolock.

34.     As the winter led to spring of 2022, Retrolock's financial condition did not improve. The line of credit being pursued at the bank did not materialize, and the ERTC refund had still not been issued by the IRS. Retrolock's CPA had indicated that the ERTC refunds were imminent. Sallyport continued to fund the account due to the urgent payroll requirement each week. Tania Tomyn and Aaron Smith had promised on multiple occasions that the ERTC checks would be remitted to Sallyport to repay Sallyport. On April 6, 2022, Tania Tomyn told me via email that unless Sallyport funded payroll she would be shutting down the company immediately.  *See* Exhibit 6 hereto. On April 29, 2022, Tania Tomyn requested an urgent payroll advance and confirmed by email to me that she authorized Sallyport to exercise its power of attorney under Section 8 of the Factoring Agreement to notify the U.S. Postal Service that mail bound for Retrolock should be delivered to Sallyport, at the address Sallyport provided.  *See* Exhibit 7 hereto. Attached hereto as Exhibit 8 is a true and correct copy of the Change of Address for Retrolock

which Sallyport provided to the U.S. Postal Service.  That was done, in part, to make sure that any mail sending payments on accounts receivables or other forms of Collateral (e.g., the Employment Retention Credit refund) would come to Sallyport.  Tania Tomyn told me via email, that Retrolock was shutting down immediately, contrary to Retrolock's promise in the Factoring Agreement Section 4.4 that it would "provide [Sallyport] with at least thirty (30) days advance written notice in the event [Retrolock] moves the Collateral… or closes any existing place of business." *See* Exhibit 6 hereto.

35.     On June 2, 2022, I was in the Los Angeles, California area on business and had arranged with Tania Tomyn to visit. I went to Retrolock's offices and found the premises locked up with a note on the door for visitors, directing them to call a number to arrange an alternative appointment.  I called Tania Tomyn and she told me that she was working from a different location that day and had decided to lock the premises up.  I asked for an alternative address to meet at, but she refused to meet that day. On June 3, 2022 I went to the office location again and found a new note on the door stating to ring the bell. I was told, over the Ring Doorbell, that Tania Tomyn and Aaron Smith were not in the building, but have reason to believe that was not true. Aaron Smith later sent text messages to the extent that they would not meet me that day but that they would arrange to meet the following day at an alternative location, but not at the office. Later that evening, myself and Nick Hart spoke to Aaron Smith who told me that WE O'Neil, a customer, was picking up inventory from Retrolock's premises. I received email confirmation from Aaron Smith for a meeting to take place at a restaurant for the following day. On June 4, 2022 I visited the business premises again. The door to the office was locked but I noticed there was activity at the side door to the warehouse which was open. A flatbed truck was being loaded with doors and frames and when I walked into the warehouse Aaron Smith was there. Aaron Smith told me that WE O'Neil

had been there that day and the day prior to remove 4 or 5 truckloads of inventory from the warehouse. Aaron continued to point out inventory in the warehouse to the movers who proceeded to prepare for it to be loaded onto the truck. I asked to see the offices and get access to the books and records, but Aaron Smith refused us access to the office. I asked that Aaron provide the paperwork to account for the inventory that was being relocated, but Aaron refused to provide it. Sallyport has asked multiple times since then for an accounting of the inventory that was moved and has received nothing in this regard.  Attached as Exhibit 9 is a true and correct copy of two photographs I took on June 4, 2022 which fairly and accurately depict a Retrolock branded forklift loading materials onto the flatbed truck.  Later that day I met with Tania Tomyn and Aaron Smith at a restaurant that they had suggested.  Tania Tomyn and Aaron Smith told me in that conversation that they had sent all of Retrolock's remaining inventory and related equipment (in which Sallyport has a UCC security interest) to one of its customers, WE O'Neil, and that Retrolock was shutting down and no longer engaged in business.  Retrolock did the foregoing despite its promise in Section 4.4 of the Factoring Agreement.

36.     Despite Section 8 of the Factoring Agreement's provision containing Retrolock's irrevocable power of attorney to Sallyport to change Retrolock's mailing address, on June 17, 2022, I received the attached email from Retrolock's Smith claiming as follows:

> Since Sallyport has put us in default, we are noticing Sallyport and Counsel that the power of attorney is rescinded and no longer valid.  Additionally, all mail that this being forwarded from Retrolock is hereby directed to stop.  Sallyport no longer has authorization.  Do NOT forward mail or open mail and power of attorney is rescinded.

A true and correct copy of this email is attached hereto as Exhibit 10 and incorporated herein by reference.

37.    Following receipt of Smith's June 17, 2022 email, I went to the U.S. Postal Service website on June 27, 2022, and electronically filed a change of address for Retrolock with a copy of Retrolock's power of attorney set forth in Section 8 of the Factoring Agreement.  Attached hereto as Exhibit 11 is a true and correct copy of the U.S. Postal Service's acknowledgement of Sallyport's change of Retrolock's address.

38.    In July 2022, Sallyport received in the mail a notice from the Internal Revenue Service, addressed to "Retrolock Corporation c/o Tania C. Tomyn, 210 W. Taft Ave., Orange, CA 92653-7838" stating, in part,

> We changed your mailing address.  We updated your mailing address in our records because the address entered on a tax return or Form 8822-B was different from the one in our records.  We will no longer mail notices and letters to the address above. In addition, we sent an address confirmation to your new mailing address.

A true and correct copy of this notice is attached hereto as Exhibit 12 and incorporated herein by reference.

39.    On July 13, 2022, I sent an email to Retrolock's Aaron Smith (with copies to Retrolock's Tomyn and Sallyport's counsel, Steven Kurtz) stating, in part, as follows:

> Subject: Notice to Sallyport West Edge lien
>
> Aaron
>
> You have changed the address with the IRS for the [Employee Retention Tax Credits] checks, the only reason for that is to circumvent the checks coming to Sallyport to repay some of your obligation as promised through the Forbearance agreement as well as multiple conversations . You have attempted to cancel the mail redirect to us that you agreed to, you have tried to do a secret deal with O'Neill to obtain $250k to again circumvent your obligation to Sallyport, despite assuring us that nothing was payable by ANY of your debtors inc O'Neill, on the same weekend that you did your 'deal', and yet you still come out with diatribe that does nothing but serve your purpose of apportioning blame and denying any and all responsibility for this situation.

17

Tania, are you seriously complicit in all of these actions as it is your name on the door here? You have a fiduciary responsibility to Sallyport as senior secured creditor as well as other creditors.

If there is no prospect of a recovery from the ERTC payments because you have deliberately diverted those payments then there is zero chance of an ADP payment from Sallyport to repay your obligation to ADP.

You owe us over $6mm - your actions are unbelievable and rest assured, our patience has diminished. We have NEVER worked with individuals that not only have caused a $6mm shortfall, but are also doing everything in their power to ensure a zero recovery to their lender but are trying to line their own pocket with any possible recoveries.

Steve, please prepare the lawsuit – we are done!

A true and correct copy of this email is attached hereto as Exhibit 13 and incorporated herein by reference.

40.     Sallyport filed the above captioned lawsuit (the "lawsuit") on August 24, 2022. When I learned from Sallyport's lead counsel in this lawsuit that the process server he had retained had been unable to locate Tania Tomyn or Aaron Smith at the addresses that they had provided us in Southern California, I conducted an internet search and learned that they had moved to Florida. According to the returns on the summons issued to Tania Tomyn and Aaron Smith, both were served with the summons and complaint in Florida.

41.     On September 29, 2022, I received an email from Retrolock's Tomyn stating to me as follows:

Good evening Emma,

Retro lock is closed. If you need our assistance, then a lawsuit should not have been filed. We have no resources, no funds, and will not be responding. You have advised all clients that you are inaccurately the "Power of Attorney" even though your attorney has not been able to provide proof of this and that you are handling all AR.

Warm regards
Tania Tomyn, CEO

18

A true and correct copy of this email is attached hereto as Exhibit 14 and incorporated herein by reference.  That same day, I received an email from Retrolock's Aaron Smith stating to me:

> Yeah right. We are broke and we don't have any resources. Any time you need of ours needs to be paid if you want our help collecting. Until terms are agreed to we will not do anything.

> Aaron Smith

A true and correct copy of this email is attached hereto as Exhibit 15 and incorporated herein by reference.

42.    On June 14, 2022, Sallyport exercised its rights under Section 2.6 of the Factoring Agreement to require Retrolock to repurchase from Sallyport $3,635,610.54 in receivables that were over 90 days old or had been disputed by Retrolock's customer.  Sallyport notified Retrolock of its default by letter on June 14, 2022, demanding full payment of all obligations due.  A true and correct copy of that letter is attached hereto as Exhibit 16 and incorporated herein by reference. Retrolock has not repaid any of its obligations to Sallyport subsequent to that demand.

43.    Defendants Retrolock and ATI provided me information regarding their anticipated Employee Retention Tax Credits payable by the U. S. Treasury and the Internal Revenue Service to Retrolock and ATI which I have summarized below:

| Retrolock Corporation | | | | AT Installation | | |
|---|---|---|---|---|---|---|
| Quarter | Amount | | | Quarter | Amount | |
| Q2 2020 | ($53,703.20) | Paid by IRS to Retrolock | | | | |
| Q3 2020 | $420,016.23 | | | | | |
| Total credit for 2020 | $473,719.33 | | | | | |
| | | | | | | |
| Q1 2021 | $674,.714.00 | | | Q1 2021 | $162,771.00 | |
| Q2 2021 | $713,454.42 | | | Q2 2021 | $455,117.75 | |
| Q3 2021 | $235,057.58 | | | Q3 2021 | $762,217.31 | |
| Total Credit for 2021 | $1,633,226.00 | | | Total Credit for 2021 | $1,380,106.06 | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| **Total Employee Retention Tax Credit** | **$2,106,945.33** | | | **Total Employee Retention Tax Credit** | **$1,380,106.06** |
| | | | | | |
| Retrolock Employee Retention Tax Credit Due | $2,106,945.33 | | | | |
| AT Installation Employee Retention Tax Credit Due | 1,380,106.06, | | | | |
| **Total Employee Tax Credit Due** | **$3,433,348.19** | | | | |

44.     With respect to Sallyport's business records attached to this Declaration as Exhibits 1 through 20, I am one of Sallyport's custodians for such records.  I am fully familiar with the methods and procedures Sallyport uses for compiling and maintaining data, information, and records concerning account receivables purchased from clients such as Retrolock, advances made to clients such as Retrolock, collections on account receivables purchased from clients such as Retrolock, fees chargeable to Retrolock under the Factoring Agreement, advances made on the Cash Flow Loan, payments received on same, and entry of interest rate changes consistent with the terms of the Factoring Agreement. I have received training on the computer systems Sallyport uses to maintain such records and understand the various codes used as shorthand to identify a particular type of activity (e.g.,  used by those systems) to denote a release of funds to Sallyport's clients, payment of funds by the customers of Sallyport's factoring clients, and the purchase of receivables from Sallyport's clients.  The entries made in Sallyport's records were made in the ordinary course of Sallyport's business, by a person with knowledge of the event or transaction reflected in the records.  The entries in the records were made at or about the time of the event or transaction entered in the records.  It was Sallyport's regular practice to make and maintain these types of records.  With respect to account receivables purchased, Sallyport's business record system allows its clients, such as Retrolock, to electronically upload to Sallyport's computer records invoices issued by Retrolock for accounts receivable to be purchased by Sallyport under

20

the Factoring Agreement.  Once the invoices are processed, Sallyport's computer system automatically reads the data related to those invoices and makes an entry in Sallyport's computer records of the amount of receivables being purchased and the identities of the client's customer and the particulars of the invoices.  Payments received from Retrolock's customers are electronically obtained from the bank, or via remotely depositing checks into a bank account under Sallyport's control.  When a fee is imposed under the terms of the Factoring Agreement, such fees are automatically entered being tied to an invoice purchase, a funding event or a collection, or hand entered if it relates to a discretionary fee for additional services.

45.     Attached hereto as Exhibit 17 and incorporated herein by reference is a Sallyport business record showing the Retrolock Cash Flow loan history by date and occurrence, from September 30, 2021 through November 30, 2021.  This reflects advances of principal, interest accruals, and any payments or credits toward interest and/or principal.

46.     Starting December 1, 2021, Sallyport switched Retrolock to a different database within our core operating platform for maintaining its books and records for the Cash Flow Loan and Sallyport's factoring activities.  Attached hereto as Exhibit 18 and incorporated herein by reference is a Sallyport business record showing the Cash Flow Loan history by date and occurrence, from December 1, 2021 through October 31, 2022.  This reflects advances of principal, interest accruals, and any payments or credits toward interest and/or principal.  The ending balance on Exhibit 17 on November 30, 2021, was $458,334.34.  At the bottom of Exhibit 17, just below the ending balance, is the cumulative principal repayment amount and interest charged for the month of November 2021 in the total amount of $41,666.66.  Sallyport exercised its discretion to advance this $41,666.66 from its "reserve" account to fund payment of $41,666.66, leaving an outstanding balance of $416,666.68 ($458,334.34 - $41,666.66 = $416,666.68).  The entry on

Exhibit 18, page 1 for December 1, 2021, shows the carryover balance of $416,666.68 entered as "other" to carry the balance forward in the new software.

47.     The entry on Exhibit 18 for October 31, 2022 shows for the Cash Flow Loan Addendum a balance outstanding on that date of $124,999.99. In July 2022, when it was clear that Retrolock had closed the business, I moved the client in our database from the "active" group.

48.     Attached hereto as Exhibit 19 and incorporated herein is the Sallyport Client Activity Statement for Retrolock for the period June 18, 2021 through November 30, 2021 for the factoring related activities, reflecting by date, the dollar amount of any receivables Sallyport purchased from Retrolock on such date, dollars received by Sallyport from Retrolock's customers in payment of receivables Sallyport had purchased from Retrolock, adjustments to the invoices, dollars advanced by Sallyport to Retrolock toward the purchase price of receivables Sallyport was purchasing, various factoring and other fees for which Retrolock was obligated under the Factoring Agreement, various miscellaneous expenses (for example, recovery of wire transfer fees when Retrolock requested advances toward payment for purchased receivables to be made by wire transfer), and adjustments made for various reasons.  The record also shows, by date, (1) the amount of receivables purchased which had not yet been paid or adjusted by Retrolock's customers (under the column labeled "Accounts Receivable") and (2) under the heading "Balances" the amount of funds which Sallyport had advanced to Retrolock as of such date net of collections or payments Sallyport had received from Retrolock's customers in payment of the receivables purchased by Sallyport.

49.     As stated above, starting December 1, 2021, Sallyport switched Retrolock to a different database in our core operating system for maintaining its books and records for Sallyport's factoring activities.  Attached hereto as Exhibit 20 and incorporated herein is a true

22

and correct copy of the Sallyport Client Activity Statement for Retrolock for the period December 1, 2021, through October 31, 2022, for the factoring related activities.   Like Exhibit 19, Exhibit 20 shows factoring related activities, reflecting by date, the dollar amount of any receivables Sallyport purchased from Retrolock on such date, dollars received by Sallyport from Retrolock's customers in payment of receivables Sallyport had purchased from Retrolock, adjustments of invoices, dollars advanced by Sallyport to Retrolock toward the purchase price of receivables Sallyport was purchasing, various factoring and other fees for which Retrolock was obligated under the Factoring Agreement, various miscellaneous expenses (for example, recovery of wire transfer fees when Retrolock requested advances toward payment for purchased receivables to be made by wire transfer), and adjustments made for various reasons.  The record also shows, by date, (1) the amount of receivables purchased which had not yet been paid by Retrolock's customers (under the column labeled "Accounts Receivable") and (2) under the heading "Balances" the amount of funds which Sallyport had advanced to Retrolock as of such date net of collections or payments Sallyport had received from Retrolock's customers in payment of the receivables purchased by Sallyport.  The entry on page 6 of Exhibit 19 for November 30, 2021, for the balance for "Accounts Receivable" (under the heading "Balances") in the amount of $5,143,542.36 is carried forward as an entry in the column titled "Purchases" (under the heading "Accounts Receivable") for December 1, 2021, on page 1 of Exhibit 20.   The entry on page 6 of Exhibit 19 for November 30, 2021, for the balance for "Funding" (under the heading "Balances") in the amount of $3,760,135.74 is carried forward as an entry in the column headed "Funding" (under the heading "Disbursements and Charges") for December 1, 2021, on page 1 of Exhibit 20.

50.    As for the amounts claimed as due and owing by Retrolock to Sallyport, they are summarized on Exhibits 17 to 20 hereto and come from the following:

i. The remaining unpaid accounts receivable balance of invoices purchased from Retrolock total $3,635,610.54, which all, or substantially all, of Retrolock's customers have refused to pay. Pursuant to Section 2.6 of the Factoring Agreement, Sallyport has requested Retrolock repurchase these at face value (the purchase price) of $3,635,610.54, by way of the June 14, 2022 letter demanding payment in full of all obligations due. This falls within the definition of "Obligation" in Section 1.29 of the Factoring Agreement which is secured by the Collateral.

ii. Sallyport overpaid for the accounts receivable by over advancing the purchase price in anticipation of new accounts receivable that Sallyport was expecting Retrolock to generate from continued operations, in order to fund the ongoing payroll that Retrolock requested to keep the business going. The gross amount funded to Retrolock, which remains unpaid, as shown on Exhibit 20 hereto was $6,085,048.65. The difference between the purchase price of the unpaid accounts receivable – $3,635,610.54 – and the amount funded – $6,085,048.65 – was an overpayment or over-advance in the amount of $2,449,438.11.

iii. The unpaid principal balance on the Cash Flow Loan, shown on Page 8 of Exhibit 18 is $124,999.99 through October 31, 2022, which is included in the above amount.

Accordingly, the total Obligation of Retrolock to Sallyport, excluding various fees, expenses, post October 31, 2022, with interest on the Cash Flow Addendum loan is $6,085,048.65 ($3,635,610.54 + $2,449,438.11).

51. The actions by Retrolock described above and summarized below provide me with serious concerns that Retrolock and its principals, Tania Tomyn and Aaron Smith, have taken or

will take actions that will frustrate Sallyport's efforts to enforce its security interest against the

Employee Retention Tax Credits:

     i.    Retrolock's failure to keep its word to give us 30 days' notice of closing of its offices;

    ii.    Retrolock diverted its remaining inventory (which was Sallyport's collateral) to WE O'Neil;

   iii.    Retrolock's change of mailing address despite it being an irrevocable power of attorney to Sallyport to control the mailing address changes;

   iv.    Retrolock's changing its mailing address with the IRS to divert the delivery of the ERTC refunds;

    v.    Retrolock's admission that it is "broke"; and

   vi.    Tomyn and Smith's fleeing from California to Florida.

Given that the amount owed by Retrolock, Tomyn, Smith, and ATI to Sallyport exceeds $6 million,

Sallyport requests that the Court grant a temporary restraining order and preliminary injunction

precluding Retrolock, Tomyn, Smith, and ATI from cashing, negotiating, assigning, or otherwise

alienating any such check, and if the refunds come to Retrolock or ATI electronically, precluding

Retrolock, Tomyn, Smith, or ATI from spending, transferring, assigning, or otherwise alienating

any such funds.

     I declare under penalty of perjury that the foregoing is true and correct.

     Executed on November 14, 2022.

                               _____

                                 Emma Hart